**McMILLAN PARK COMMITTEE, et al., Plaintiffs,**

v.

**NATIONAL CAPITAL PLANNING COMMISSION, et al., Defendants.**

**Civ. A. Nos. 90–1513, 90–1941.**

United States District Court, District of Columbia.

March 21, 1991.

Katherine Meyer and Anne Spielberg, Harmon Curran & Tousley, Washington, D.C., Andrea Ferster, National Trust for Historic Preservation, Lovida H. Coleman, Washington, D.C., for plaintiffs.

John C. Cleary, U.S. Attorney's Office, Nancy G. Dunn, District of Columbia Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

On February 15, 1991, the parties in this matter appeared before this Court to argue cross-motions for summary judgment. This is an action challenging defendants' failure to comply with various review procedures before approving § 2(a)(10)(L)(b)(110) of the D.C. Comprehensive Plan Amendments Act of 1989, an amendment to the District of Columbia Comprehensive Plan (the "Plan") which changed the permitted land uses for McMillan Park (the "Park") from "parks, open space, and recreation" to "mixed development" including commercial and residential development.

The case consists of two consolidated actions. Defendants in both cases are the same. The federal defendants are the National Capital Planning Commission (the "National Commission"), the federal agency responsible for land use planning in the District of Columbia, and its chairman, and the District of Columbia defendants are the Mayor and the Director of the D.C. Department of Administrative Services. Plaintiffs in the first action are the members of McMillan Park Committee (the "neighborhood plaintiffs"), a non-profit organization made up of individuals who live in the area adjacent to the Park and who are committed to preserving its historical, cultural and aesthetic values.

Plaintiffs in the second action are the National Trust for Historic Preservation in the United States (the "National Trust") and the D.C. Preservation League ("the League"). The National Trust is a private educational, charitable, non-profit corporation chartered by Congress in 1949 to further the nation's historic preservation policy. The Chairman of the National Trust is a member of the United States government's Advisory Council on Historic Preservation ("Advisory Council"), a federal agency whose duties include implementation and enforcement of the National Historic Preservation Act. The League is a non-profit corporation created in 1971 to protect the historic sites of the District of Columbia. The members of both organizations join in the suit, and collectively, plaintiffs in the second case will be referred to as the "preservation plaintiffs."

Both cases are based on the same set of undisputed facts. Although their theories are slightly different, all plaintiffs seek a declaratory judgment that the specific D.C. map amendment at issue is void and seek to enjoin defendants from enforcing it.

*Legal Framework:*

Until 1973, land use planning for the District of Columbia was vested exclusively in the National Commission, pursuant to the National Capital Planning Act ("NCPA"), 40 U.S.C. §§ 71 *et seq.* In 1973, Congress enacted the Home Rule Act, Pub.L. 93–198, which, among other things, amended the NCPA. These amendments required the development of a "Comprehensive Plan" for the District, to be developed through the combined efforts of the National Commission and the District government.

Thus, under Home Rule, the National Commission is "the central Federal planning agency for the Federal Government in the National Capital." As such, the National Commission is charged with the duty to preserve the District's "important historical and natural features." 40 U.S.C. §§ 71a(a)(1). While the National Commission is responsible for the federal aspects

of the Comprehensive Plan, the Mayor of the District is responsible for the District elements. *Id.* §§ 71a(a)(2). However, the National Commission is charged with the responsibility of ensuring that the District elements of the Comprehensive Plan do not have a "negative impact" on the federal interests protected by the National Commission, that is, the historic and natural features of the District. *Id.* § 71a(a)(4).

Accordingly, the Mayor and the City Council must submit the Comprehensive Plan and any amendments thereto to the National Commission for "review and comment with regard to the impact of such element or amendment on interests or functions of the Federal Establishment in the National Capital." *Id.* § 71a(a)(3). The National Commission then has sixty days to certify to the District whether the Plan has a negative impact on a federal interest.

If the National Commission does find such a negative impact, the District has the opportunity to modify the plan so as to cure the negative impact on federal interests. If the modifications are judged insufficient by the National Commission, the proposed plan "shall not be implemented." *Id.* §§ 71a(a)(4)(B)–(C). Thus, the National Commission in effect exercises "veto authority ... over those proposed District elements, prepared by the Mayor and approved by the Council of the District of Columbia, that [the National Commission] determine[s] would have a negative impact on the interests or functions of the federal establishment." *Tenley & Cleveland Park Emergency Committee v. District of Columbia Board of Zoning Adjustment,* 550 A.2d 331, 335 (D.C.App.1988), *cert. den.* 489 U.S. 1082, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989).

The National Commission's procedures are governed by the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.* Enacted in 1966, the NHPA is dedicated to preserving the nation's historic

properties so that its "vital legacy of cultural, educational, aesthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations of Americans." *Id.* § 470(b). The National Register of Historic Places is established by the NHPA. *Id.* § 470a(1)(A)–(B). Once a property has been listed or is eligible for inclusion in the Register, it is entitled to a range of protections under federal, state and local preservation programs.

The NHPA protects historically significant property by ensuring that federal agencies take into account any adverse effects a federal "undertaking" might have on such property. The most important safeguard in the NHPA is § 106:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking *shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.*

16 U.S.C. § 470f (emphasis added).

In addition, under § 106, the Advisory Council is to be given a reasonable opportunity to comment with regard to the undertaking. *Id.* The Advisory Council, established by the NHPA as an independent federal agency, is authorized to "promulgate such rules and regulations as it deems necessary to govern the implementation" of § 106.[1] The regulations issued by the Advisory Council provide that federal agencies must complete the section 106 process prior to any undertaking, and admonish agencies that the process should be initiated early on when there is the widest

---

**1.** The Advisory Council is made up of a Chairman appointed by the President, the Secretary of the Interior, the Architect of the Capitol, the Secretary of Agriculture and the heads of four other agencies which deal with historic preservation, one Governor, one mayor, the President of the National Conference of State Historic Preservation Officers, four experts in the field of historic preservation, three at-large members of the general public, and the Chairman of the National Trust for Historic Preservation, one of the plaintiffs in this action.

possible range of feasible options to consider. 36 C.F.R. § 800.3(c).

A § 106 procedure requires the agency in charge of the undertaking to identify which if any historic properties may be affected by the undertaking, and to assess the effect the agency's undertaking will have on them. If it is determined that the effect will be "adverse," the agency must seek ways to avoid or reduce the adverse effect. The Advisory Council must be given an opportunity to comment on whether the undertaking will have an adverse effect and on which measures might reduce such effect. The agency, finally, enters into a Memorandum Agreement with all interested parties which outlines the measures that will be taken to protect the property against adverse effects. *See* 36 C.F.R. § 800 et seq.

In most cases where adverse effects are found, the Advisory Council has been successful at bringing the agency, the developer or other party responsible for the effect, and other interested parties together in order to draft the Memorandum Agreement. The Agreement is binding on all who participate in it. Thus, the § 106 procedure has proved very effective at reducing adverse effects on protected sites while finding a means by which development of the undertaking can still go forward.

Plaintiffs in this action allege that the National Commission did not follow these § 106 procedures in approving the District's proposed amendment to the Comprehensive Plan. Defendants allege that the § 106 process did not apply to this amendment.[2]

*Background:*

The Park is located in Northwest Washington, D.C., between North Capital Street and Michigan Avenue. It is a 25–acre park, designated at the turn of the century as the site for D.C.'s first water treatment facility by the federal government. The Park is a component of the larger 92–acre McMillan Reservoir, designed by the noted landscape architect Frederick Law Olmsted, Jr. as part of the 1901 "McMillan Plan," named for Senator James McMillan. The Park was used by the public as a picnic ground and park until it was fenced in during World War II by the Army Corps of Engineers. However, the water filtration plant continued to operate as one of the country's last remaining slow sand filter plants. In 1986, when it was replaced by a fast sand filtration plant, the old McMillan Water Treatment Plant was designated an American Water Landmark by the American Water Works Association.

The National Commission considered the status of the Park during the drafting of the District's first Comprehensive Plan under Home Rule in 1983. Noting that the Park should be conserved and its open space character preserved, the National Commission designated the Park as part of the "National Capital Open Space System" under the federal "Parks, Open Space and Natural Features" element of the Comprehensive Plan. The National Commission explained that sites in this category needed to be preserved from unnecessary development that would compromise their essential character as open spaces. The Park was also designated a "Special Place" due to its historical significance, thereby signalling that any development should be in accord with its role as a historic place.

The District's Land Use element of the Comprehensive Plan, enacted in 1985, followed the National Commission's designations. The Park, which was still federally owned at that time, was placed under the Comprehensive Plan in the "parks, recreation and open space" category of permitted

**2.** The Neighborhood Plaintiffs also contend that defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., which requires federal agencies to include a detailed environmental impact statement in proposals for legislation or other actions which significantly affect the quality of "the human environment." The National Commission, in order to comply with NEPA, requires environmental statements which discuss the historic and aesthetic effects of any proposed project, and ameliorative alternatives to the proposed action must be included. The Preservation Plaintiffs join only in the § 106 claim. Because this case can be decided with reference to the § 106 claim alone, this Court need not address the NEPA claim.

land use. Commercial development of the Park was therefore not permitted.

In 1986, the federal government decided to sell the Park to the District as the site was no longer needed by the Army Corps of Engineers for water treatment. The National Commission was not involved in the transaction, as it was being handled by the General Services Administration ("GSA"). However, the National Commission nonetheless wrote to the GSA, recommending that any forthcoming development of the Park "not have an adverse impact on [its] historic open space character."[3] In addition, the National Commission advised the GSA to request an Advisory Council determination of the Park's eligibility for listing in the National Register of Historic Places, which would ensure that a § 106 process was followed in the disposition of the site.[4]

On September 29, 1986, the Advisory Council notified the GSA that the Park was possibly eligible for inclusion in the National Register, and that the GSA's plans to transfer the site to the District should therefore undergo a § 106 procedure so that the Council could have an opportunity to comment on and address any adverse effects the transfer might have. Ultimately however, the GSA did not undergo the formal § 106 process. Instead, the GSA in effect postponed the process by including restrictive covenants in the deed of sale, which in defendants' view required that the equivalent of a § 106 procedure take place prior to any development of the Park.[5] Defendants explained at oral argument that this was deemed to satisfy the requirements for the sale of the site, as it did not entail any actual development or changes in allowed development.

On October 24, 1989, the City Council passed a number of amendments to the Comprehensive Plan, including § 2(a)(10)(L)(b)(110), a change in the land use designation for the Park, from "parks, open space and recreation" to "mixed use," allowing for medium density residential and moderate density commercial development (the "Park Amendment"). Meanwhile, a "Development Prospectus" was issued by the District's Department of Administrative Services soliciting proposals for the commercial development of the Park. While developers were advised of the historic significance of the site, and the D.C. Preservation Office recommended that the Park be listed in the National Register of Historic Places, no specific restrictions were announced which would protect the Park from any adverse impact.

Pursuant to the NCPA, the District submitted the Amendments, including the Park Amendment, to the National Commission for its determination as to whether any of the amendments would have a "negative impact" on a federal interest. After hearing testimony that the Park had historic significance which should be considered in a § 106 procedure before the Park Amendment was approved, the National Commission expressed "grave concern" about the proposed development of the Park and indicated that development which was not congruent with the Park's open space character should be avoided. The Commission requested that the District give special consideration to preserving the historic open space character of the site as well as to protecting the views across the site of the U.S. Capitol from the U.S. Soldiers' and Airmen's Home.[6] Nonetheless, the National Commission did not require the District to modify the Park Amendment in order to have it approved, although modifications were required on other elements in the Comprehensive Plan Amendments.[7]

**3.** National Commission Report to the GSA, May 1, 1986.

**4.** *Id.*

**5.** The covenants provide that the District must conduct a historical and cultural survey of the Park and submit it to the Advisory Council prior to any development. Moreover, any plans for development must be approved by the District's

Historic Preservation Officer, and conflicts are to be resolved by the Advisory Council.

**6.** February 22, 1990, National Commission Executive Director's Recommendation.

**7.** In addition to its evaluation under NHPA, the National Commission required that an environmental assessment be done on the effects of the Park Amendment. However, since the Commis-

On March 22, 1990, the Advisory Council advised the National Commission that under the NHPA, a § 106 procedure was required before the Commission could officially approve the Park Amendment. The National Commission responded that in its view, the approval of the Park Amendment was not an "undertaking" and was therefore not subject to the § 106 requirements. Accordingly, by letter dated April 4, 1990, the National Commission transmitted its final written approval of the Comprehensive Plan Amendments to the District.

Meanwhile, the Amendments had been submitted to Congress by the District on March 30, 1990 for a thirty-day review, in accordance with § 602(c)(1) of the Home Rule Act, D.C.Code § 1–233(c)(1). On May 23, 1990, when Congress failed to exercise its veto authority, the Amendments became law.

*Discussion:*

■ Plaintiffs contend that the Park Amendment is unlawful because it was passed without formal § 106 consideration of the adverse impact it would have on the undeniable federal interests in the Park. According to plaintiffs, because the National Commission had the authority to either approve or veto the Amendment, review of the Amendment was a "federal undertaking" and was therefore subject to a § 106 procedure.

Defendants concede that a federal interest was at stake in the Park and concede that no § 106 procedure was followed. They argue, however, that the National Commission's authorization of the Park Amendment was nonetheless proper because review of the Amendment was not an undertaking, and therefore the Commission was without the right to pursue the § 106 procedure. According to defendants, the National Commission would only have had jurisdiction to comply with § 106 once it

had determined that there was an adverse impact and decided to veto the Amendment.

Before even reaching the issue of whether the National Commission's review was an "undertaking," it is clear that defendants' position has little merit. According to defendants, the National Commission had to decide that there was or was not a negative federal impact without the benefit of the § 106 procedure. However, Congress could not have intended that the National Commission make a "no negative impact" determination in the absence of the necessary information and background. Instead, Congress specifically provided for the § 106 procedure to inform the agency's decision-making process, so that at no step in the process would the National Commission be forced to operate in the dark.

The Advisory Council was created by Congress to guide these sorts of decisions, and the Council's regulations require that the § 106 procedure be invoked at an early stage in the proceeding, before anything has been authorized or vetoed. The governing regulations explain that the § 106 procedure is "designed to identify potential conflicts between [historic preservation concerns with the needs of Federal undertakings]." 36 C.F.R. § 800.1(b). It would be senseless to assume, as defendants' position would require, that the Advisory Council's role begins only after the National Commission has discovered a negative impact without the help of outside consultation.

It is true, of course, that the National Commission need not proceed with a full § 106 analysis every time any proposal is submitted to it by the District. The National Commission is charged with a very specific duty: to ensure that the *federal interests* in the District are not negatively impacted. 40 U.S.C. § 71a(a)(4). Thus, where there is no federal interest involved or where there is no impact whatsoever,

sion found that there would be no significant impact on the environment, it did not prepare an environmental impact statement. There was no consideration of the impact on the Park's historic environmental features, and, therefore, plaintiffs contend that the Commission's environmental decision was arbitrary and capri-

cious. Although this Court is not addressing the NEPA question, it might well be in defendants' interests to more fully evaluate the environmental impact issues raised by the neighborhood plaintiffs when the Park Amendment is sent back for a § 106 procedure under the NHPA.

the National Commission has no authority to veto a proposal.

Clearly, under § 106, the first step the National Commission must take when a proposal is submitted is to determine whether or not the undertaking involves historically significant property. If there is no such property involved in the undertaking, "the Agency Official is not required to take further steps in the section 106 procedure." 36 C.F.R. § 800.5(d). In this case, however, there is no question that the Park is "historically significant," as the definition of historically significant property is that which is eligible for inclusion in the National Register. 36 C.F.R. § 800.4.

An agency may still avoid a full § 106 procedure if it is determined that there will be no "effect" whatsoever on the protected property. An "effect" includes any potential effect, negative or positive, on the character of the historic property. *See, Evans v. Train*, 460 F.Supp. 237, 246 (S.D.Ohio 1978). Moreover, a finding of "no effect" must be announced officially and the findings concerning this determination must be documented and explained. Once such a determination has been announced, it becomes effective within 15 days if there is no objection. 36 C.F.R. §§ 800.5, 800.8.

There has not been a finding of "no effect" by the National Commission. Changing or adding to the permissible uses of the Park would clearly have an "effect" on the Park's open space and historical qualities. This is indisputable. The National Trust for Historic Preservation, a plaintiff in this case and a member of the Advisory Council, expressed its apprehension about the Plan's impact on the Park in testifying before the National Commission on February 22, 1990. Indeed, the Commission itself expressed its "grave concern."

While finding an "effect" did not by itself mandate that the National Commission ultimately conclude that the effect was adverse, it did require that the § 106 process be pursued in order for the National Commission to announce, as it did, that the effect was not negative. *See* 36 C.F.R. § 800.5(c). Although the National Commis-

sion certainly has discretion concerning its actions, as the court noted in *Ely v. Velde*, 451 F.2d 1130, 1138 (4th Cir.1971), "Discretion does not include the right to act perfunctorily or arbitrarily. The agency must not only observe the prescribed procedural requirements and actually take account of the factors specified, but it must also make a sufficiently detailed disclosure." The National Commission, however, concluded that there was no negative impact without considering the necessary factors, and this it did not have discretion to do.

Defendants attempt to derail this position by asserting that such analysis was not required because review of the proposed Amendment was not a "federal undertaking." According to defendants, the National Commission has no authority to veto purely "local" legislation, so its review of such legislation is simply advisory and therefore not an undertaking. Of course, even defendants are constrained to admit that legislation is not purely "local" if a negative impact on a federal interest is found. Thus, defendants' definition of an undertaking requires a tortured construction of the National Commission's authority. Essentially, defendants contend that the Commission has authority only once it finds that it has authority.

Defendants rely on *Techworld Dev. Corp. v. D.C. Preservation League*, 648 F.Supp. 106 (D.D.C.1986), in support of this argument. In *Techworld*, the court held that where the closing of Eighth Street, N.W., had to be submitted to the National Commission for advisory comment, there was no federal undertaking requiring a § 106 analysis. Defendants, here, argue that because the National Commission—unless it somehow found a negative impact— could do nothing but advise the District not to damage the special character of the Park, its role was similarly advisory and hence there was no federal undertaking.

This analysis begs the question. In *Techworld*, the National Commission played a purely advisory role. Its comments were nonbinding, and had it disapproved the street closing, the District could have nonetheless proceeded. However,

even defendants cannot dispute the fact that were the National Commission to have found a negative impact in this case, it could have vetoed the Amendment and stopped the District from going forward. Thus, the role played by the National Commission is not simply advisory.

Authorization, contrary to the position asserted by defendants, is enough to amount to a federal undertaking requiring a § 106 procedure. As the court noted in *Techworld,* 648 F.Supp. at 119–20, a local project becomes a federal undertaking where the agency gives its approval, sanction, assistance or support to the project. Similarly, in *Sierra Club v. Hodel,* 848 F.2d 1068, 1089 (10th Cir.1988), the court ruled that the crux of a determination of a federal undertaking "is an agency's authority to influence significantly nonfederal activity." [8] Even more recently, in *Lee v. Thornburgh,* 877 F.2d 1053, 1056 (D.C.Cir. 1989), Judge Mikva noted that § 106 provisions "are triggered only when *approval* or financial assistance from a federal agency is involved." (Emphasis added). Approval is generally defined as a "license," as this is the term used in the applicable regulations. *See* 36 C.F.R. § 800.2(*o*). However, as Judge Mikva notes, the term license means the granting of "necessary permissions for [a] proposed [plan]." *Id.* at 1057. A federal agency has the authority to license a local plan where it has, for example, "the right to approve or disapprove the site, the design, and the construction plans." *Id.*

There is no question that the National Commission was empowered to either approve or disapprove the District's proposed Park Amendment. This is specifically provided for in the NCPA. Clearly, then, the National Commission's review of the District's proposed Park Amendment was a federal undertaking. This position was forcefully endorsed by the Advisory Council which was empowered by Congress to make the implementing regulations for the NHPA. The Council's General Counsel informed the Commission that its review of the Park Amendment was an undertaking because the Commission had the power to exercise disapproval authority. In support of this position, the Council provided two similar examples which are clearly undertakings: the Secretary of State's authority to disapprove the provision of benefits to Foreign Missions as well as such missions' proposed actions affecting real property, and the authority of the Bureau of Land Management to delay mining activities through the issuances of "notices to mine."

■ Defendants have argued, in the alternative, that there was no need for a formal § 106 procedure because the federal interests in the Park were adequately protected when the GSA put restrictive covenants in the deed to the Park. Because the covenants provide that any ongoing development must be scrutinized by the District's historic preservation agency, defendants contend that there can be no development which is not compatible with the Park's historic character. Hence approving the Park Amendment, defendants argue, will not impact the federal interest in the Park.

Essentially, this is a post-hoc determination of "no effect." Since the National Commission never found that there was "no effect," this after-the-fact attempt to rationalize the Commission's actions is without merit. Indeed, it is far from clear that a finding of "no effect," based on the protections in the GSA covenants, would have been permissible. The covenants simply do not provide the same degree of protection as a § 106 procedure. While the covenants allow the Advisory Council to comment on any proposed development, they do not provide that such comments are binding. The covenants' establishment of a procedural mechanism that must be followed by the District before there can be final authorization of any actual develop-

---

**8.** *Sierra Club* actually deals with the "major federal action" requirement under NEPA. However, as defendants have conceded, the "major federal action" and "federal undertaking" standards have been held to be equivalent by the federal courts. *See Vieux Carre Property Owners, Residents & Associates, Inc. v. Brown,* 875 F.2d 453, 464–65 (5th Cir.1989), *cert. den.* —— U.S. ——, 110 S.Ct. 720, 107 L.Ed.2d 739 (1990).

ment does not provide the same binding modification requirements that the Advisory Council may issue in a § 106 procedure.

■ In addition, it is clear that the NHPA applies whenever a federal agency has authority over a project. The National Commission had authority in this case and should have undertaken the § 106 procedure. It is irrelevant that when the GSA exercised authority over the sale of the Park, it provided for a procedure that is asserted to be a functional equivalent of § 106. This so-called functional equivalent in 1987 may not substitute for the actual § 106 procedure that is required, by statute, at this juncture. The NHPA applies at any stage of an undertaking where there is an impact on federal interests. *See, Watch v. Harris,* 603 F.2d 310 (2nd Cir.1979), *cert. denied,* 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979) (section 106 procedures apply to the different phases of a project and must be complied with again when the agency next has authority to approve or fund the project.) The issues may be different at each phase of an undertaking, and the opportunities for modifying a negative impact may change over time and with varying circumstances. Thus, even if the GSA covenants were the functional equivalent of the § 106 process, the National Commission would not have been excused from its Congressionally mandated duty to comply with § 106.

This Court has been unable to discern any valid reason why the Commission should have attempted to avoid the § 106 process. It is not an expensive or an unduly cumbersome process, and it allows for an informed decision to be made. The § 106 procedure considers the wishes of all interested parties and the outcome is generally a binding agreement. Development is not usually hampered but instead proceeds in a way that preserves historical and cultural values.

This Court finds that the National Commission violated its § 106 duties under the NHPA. It is clear that the Park Amendment will have some impact on the federal interests in the Park. The National Commission is required to conduct a formal § 106 procedure to determine whether the impact from the Amendment will be negative. The Commission was not entitled to announce that there was no negative impact without going through the procedure mandated by § 106.

The National Commission's decision to ignore the recommendation of the Advisory Council was arbitrary and capricious under the Administrative Procedure Act, ("APA") 5 U.S.C. § 706(2)(A). The Commission was informed of the Council's position with time enough for a § 106 procedure to take place. It is undeniable that there was a federal interest in the Park and that the Commission knew there was a possibility of a significant negative impact, given its expression of "grave concern." The Commission's decision not to proceed with an exploration of all the relevant factors not only violated its duties under § 106, but also transgressed the NCPA's mandate to determine the impact of the Park Amendment on federal interests. In addition, the National Commission's decision to approve the Park Amendment perfunctorily was a violation of the APA.

*Relief:*

■ Defendants argue that this Court is without the power to order relief. They advance two arguments in support of this position. First, they argue that a legal challenge to the Park Amendment's approval could be filed against the National Commission only within the 60–day comment period allowed under the NCPA. Defendants rely on 40 U.S.C. § 71a(a)(4)(A):

> The Commission shall, within sixty days after receipt of such a District element of the comprehensive plan, or amendment thereto, from the Council, certify to the Council whether such element or amendment has a negative impact on the interest of functions of the Federal Establishment in the National Capital. *If within such sixty days the Commission takes no action with respect to such element or amendment, ... such element or amendment shall be incorporated into the comprehensive plan for the National Capital and shall be implemented.*

Defendants contend that because the Park Amendment was deemed approved at the end of 60 days in the absence of any adverse decision by the National Commission, the plaintiffs' action comes too late. According to defendants, the only time that a justiciable legal challenge may be filed against the National Commission is within the 60–day period.

Defendants essentially ask this Court to rule that any time the National Commission fails to act, its inaction is unreviewable. Defendants depict their argument as allowing a limited period for judicial review, but, plainly, their tortured interpretation of the statute allows no time in which a legal attack may properly be mounted.

There obviously exists no cause of action until the National Commission has acted in some way—either by rejecting or approving the Amendment, or by allowing the 60 days to expire without acting. In the face of inaction by the National Commission, plaintiffs' cause of action could not accrue until the 60th day had expired. Until that time, the National Commission might still have acted to reject, approve, or otherwise deal with the proposed Amendment. Defendants' position is clearly untenable, as it would mean that plaintiffs' cause of action expired the moment it accrued.

The National Commission's failure to act does not become "unreviewable" simply because the proposal has become effective, as defendants argue. Defendants contend that since the NCPA provides that a plan "shall be implemented" if the Commission fails to act, the plan is now immune from attack. If this were the case, anytime an agency made a decision which had the force of law, no judicial review would be available. This is an untenable conclusion and a misinterpretation of the NCPA. While an agency's decision may have the force of law, a legal challenge filed in the proper judicial forum may result in that action being reversed or invalidated. The National Commission's actions or failures to act are not immune from judicial review anymore than the actions of any other agency.

■ Defendants next argue that this Court may not invalidate a District of Columbia law, because it has the force of a Congressional enactment. The Park Amendment became law when Congress failed to act upon the Comprehensive Plan in the time allowed by the Home Rule Act. Defendants' position lacks merit entirely. Clearly Congress could not have intended that its silence could permit an invalid law to withstand legal challenge. This Court has authority to invalidate the District of Columbia's actions where those actions contravene federal law.

■ Where the NHPA has been violated and an action is being undertaken in violation of the Act's requirements, "injunctive relief should be granted against continuation of the action until the agency brings itself into compliance." *Realty Income Trust v. Eckerd*, 564 F.2d 447, 456 (D.C. Cir.1977). In *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783 (D.C.Cir.1971), the Atomic Energy Commission had failed to prepare a sufficient environmental impact statement, and the court ruled that the project could therefore not go forward, even though Congress had authorized and released funds for the project. Congressional approval of agency action is contingent on the agency's following the necessary procedures. Congress cannot excuse an agency from executing its duties, and any claim of a violation must be determined and remedied by the courts. *Id.* at 705.

Likewise, a court may apply its equity powers to invalidate a statute passed due to an agency's violation of the law. In this case, Congress' approval of the Comprehensive Plan was based on the assumption of its having been validly prepared and submitted. Certainly, had Congress been aware that the Plan was the product of regulatory violations, it is hoped it would have exercised its veto authority. This Court has determined that the Park Amendment was improperly approved and is therefore invalid. The appropriate remedy, therefore, is to void the Park Amendment and to prohibit any actions taken in reliance upon it.

*Conclusion:*

The NHPA stresses Congressional commitment to this nation's historic, cultural, and environmental heritage. In addition, Congress enacted a specific procedure for land-use and planning in the District of Columbia, which emphasizes the importance of these concerns in the nation's capital. The National Commission has a responsibility to abide by the governing procedures, regardless of the agency's independent assessment of the proposal. If, as defendants contend, the Park Amendment has little effect on the protected interests in the Park, the § 106 procedure should not be burdensome.

It is hoped, the process will bring together important competing interests and, under the aegis of the Advisory Council, allow for a compromise from which the parties as well as the citizens of the District of Columbia will profit. The procedure is not designed to inhibit development; rather, its purpose is to assure that land development takes place in a manner which respects the historic and cultural interest that this nation has in its Capital. The National Commission's failure to comply with the procedure was unacceptable. Because its approval of the Park Amendment is void as an arbitrary and capricious act in violation of the governing statutes, the defendants will be enjoined.

An Order accompanies this Opinion.

## ORDER

Upon consideration of cross-motions for summary judgment, the memorandum and exhibits in support thereof, all responses and oppositions thereto, oral argument, and the entire record in this case, it is hereby

ORDERED, that plaintiffs' motions for summary judgment are granted in part; and it is further

ORDERED, that the McMillan Park Amendment of the Comprehensive Plan Amendments Act of 1989, D.C. Law 8–138, is void as a matter of law because the National Commission failed to comply with § 106 of the NHPA; and it is further

ORDERED, that defendants are hereby enjoined from implementing the McMillan Park Amendment until such time as the National Commission has complied with the § 106 procedure.