WATERFORD CITIZENS' ASSOCIATION, Plaintiff–Appellant,

v.

William K. REILLY, Administrator EPA; Loudoun County Sanitation Authority, Defendants–Appellees,

and

Advisory Council on Historic Preservation; Department of Historic Resources, Defendants.

Preservation Alliance of Virginia, Amicus Curiae.

No. 91–2142.

United States Court of Appeals, Fourth Circuit.

Argued March 3, 1992.

Decided June 15, 1992.

Katherine Jo Henry, Mayer, Brown & Platt, Washington, D.C., argued, for plaintiff-appellant.

Jacques B. Gelin, U.S. Dept. of Justice, Washington, D.C., Thomas Francis Farrell, II, McGuire, Woods, Battle & Boothe, Alexandria, Va., argued (Barry M. Hartman, Acting Asst. Atty. Gen., Carl Strass, David C. Shilton, Apphia Theresa Schley, U.S. Dept. of Justice, Washington, D.C., Richard Cullen, U.S. Atty., Paula P. Newett, Asst. U.S. Atty., Alexandria, Va., Laurie Ford, U.S. E.P.A., Washington, D.C., Joseph W. Wright, III, McGuire, Woods, Battle & Boothe, Alexandria, Va., on brief), for defendants-appellees.

Richard B. Nettler, Robins, Kaplan, Miller & Ciresi, Washington, D.C., for amicus curiae.

Before SPROUSE, Circuit Judge, KISER, United States District Judge for the Western District of Virginia, sitting by designation, and BLATT, Senior United States District Judge for the District of South Carolina, sitting by designation.

## OPINION

SPROUSE, Circuit Judge:

The Waterford Citizens' Association (Citizens' Association),[1] in an action for declaratory judgment, claimed that the Environmental Protection Agency (EPA)[2] is obliged to reinstitute procedures mandated by section 106 of the National Historic Preservation Act (NHPA or the Act) before a contemplated expansion of an existing sewage system can go forward. The district court concluded that the decision was within the EPA's discretion and dismissed the suit. We affirm the judgment, although on different grounds than those relied upon by the district court.

### I

Waterford is a village of 350 residents located in Loudoun County, Virginia. Because of its Quaker and industrial past, its virtually unchanged appearance since the early 1800s, and the unspoiled landscape which surrounds the village, it is listed on the National Register of Historic Places. In 1970, the Loudoun County Sanitation Authority (Sanitation Authority) contracted for the construction of a sewage collector system and treatment works for Waterford.[3] The sewer system was completed in 1978.

Because the project was funded by the EPA[4] and affected a site listed on the National Register, the Sanitation Authority and the EPA were required to comply with the provisions of the National Historic Preservation Act and the regulations promulgated pursuant to it. 16 U.S.C. §§ 470f, 470h–2(f). Section 106 of the Act requires federal agencies to give the Advisory Council of Historic Preservation (Advisory Council) an opportunity to comment on the effect a federal undertaking will have on a historic site.[5] Pursuant to regulations is-

---

1. The Waterford Citizens' Association is a non-profit unincorporated group of village residents whose purpose is to preserve Waterford's historic character.

2. The Citizens' Association sued the parties to the agreement at issue—the EPA, the Advisory Council on Historic Preservation, and Virginia's Department of Historic Resources; the court allowed the Loudoun County Sanitation Authority to intervene because a decision for the Citizens' Association 6350 35 9 would affect its ability to expand the sewage system.

3. The system was conceived to eliminate the health hazards of the existing "system" of privately maintained septic tanks and cesspools.

The new system is composed of 10,400 linear feet of eight inch diameter sewer lines, located largely within the village, and the treatment facility, located outside the village boundary near Catoctin Creek.

4. The project was funded by the EPA under the Federal Water Pollution Control Act, 33 U.S.C. § 1251. The EPA made the final grant payment to the Sanitation Authority in 1985.

5. Section 106, in its entirety, reads:
   Effect of Federal undertakings upon property listed in National Register; comment by Advisory Council on Historic Preservation
   The head of any Federal agency having direct or indirect jurisdiction over a proposed

sued under the NHPA by the Advisory Council,[6] the EPA solicited comments regarding the impact of the proposed system upon the historic character of Waterford from the Advisory Council and the Virginia Historic Preservation Officer.

The participants agreed that the sewer system would adversely affect the historic site by damaging the buildings and landscape during the construction period and by stimulating growth and development after its construction.[7] When adverse consequences are identified, the Advisory Council's regulations provide that the granting agency may enter into a Memorandum of Agreement (Agreement) in which it promises to follow appropriate procedures to mitigate those effects. 36 C.F.R. §§ 800.-5(e)(4) and 800.6(c)(1). Accordingly, the EPA, Virginia's Historic Preservation Officer, and the Advisory Council executed such an agreement. The EPA agreed, *inter alia*, to ensure that the Sanitation Authority submit any revision of the sewer system's final plan to the Virginia Historic Preservation Officer.

The genesis of this litigation is the 1990 request (twelve years after the completion of the sewer system) of a developer to hook the sewer lines of a proposed townhouse development, located outside of the village boundaries, into Waterford's sewer system. Although the treatment plant has unused capacity and the hookup will not necessitate an addition to the plant, the hookup will require additional sewer lines. Loudoun County and the Sanitation Authority indicated that the request would be granted. The Sanitation Authority requested no additional grant money from the EPA for the expansion, nor did it consult with Virginia's Historic Preservation Officer.

The Advisory Council and the Virginia Historic Preservation Officer interpreted the proposed hookup as a revision of the system's final plan, however, and concluded that it triggered anew the EPA's obligation. Accordingly, they requested that the EPA comply with the agreement by directing the Sanitation Authority to submit the proposed revisions to Virginia's Historic Preservation Officer for review, thus reopening the section 106 process. When the EPA refused, the Citizens' Association filed suit in the United States District Court for the Eastern District of Virginia, asking for a declaratory judgment that section 106 of the NHPA requires the EPA to comply with its agreement by interceding in the proposed expansion of the sewer lines.

The EPA responded to the complaint by moving to dismiss on the ground that the Citizens' Association had failed to allege standing. The court, however, granted the Association's motion to amend its complaint on the same day, and the amended complaint alleges standing. The dismissal motion also contended that the complaint failed to state a claim because the EPA has no mandatory duty to "enforce" the Memorandum of Agreement. After a hearing, the court granted the EPA's 12(b)(6) motion to dismiss, reasoning that because that decision was within the prosecutorial discretion of the EPA, the Citizens' Association did not have standing to compel the EPA to implement the agreement.

## II

We are not certain that the district court invoked the doctrine of standing

Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470v of this title a reasonable opportunity to comment with regard to such undertaking.
16 U.S.C. § 470f.

**6.** *See* 16 C.F.R. Part 800.

**7.** The system was designed to serve the existing lots within the village boundaries and to provide sewer services for a population of 557. When the system was designed, it was anticipated that the development of vacant lots within the village limits would support a population of 557 people by the year 2000. The current population of the village is 350.

in the traditional sense. In any event, the Citizens' Association clearly has standing to bring this issue to court. In considering the propriety of a Rule 12(b)(6) dismissal, the standard of review is whether the complaint, accepting the allegations as true, allows a recovery. *Hospital Building Co. v. Rex Hospital Trustees,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). Here, the Citizens' Association has alleged a threatened injury which can be fairly traced to the conduct of the EPA and which can be redressed by a judicial decision. These are, of course, the two elements necessary to establish standing under Article III of the Constitution. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The Citizens' Association also meets the test for organizational standing. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Natural Resources Defense Council, Inc. v. Watkins,* 954 F.2d 974 (4th Cir.1992). This court has recognized the standing of an organization to represent similar interests. *See Ely v. Velde,* 451 F.2d 1130 (4th Cir.1971).[8]

■ We nevertheless affirm the judgment of the district court. We note at the outset that the scope of the obligations imposed upon federal agencies by the enactment of section 106 is quite narrow. The affirmative duties are clearly stated: agencies "shall prior to the approval ... of the expenditure of any Federal funds on the undertaking ... take into account the effect of the undertaking ..." and "afford the Advisory Council ... an opportunity to comment. ..." 16 U.S.C. § 470f. In imposing these general obligations, Congress did not create a primary role for federal agencies to protect historic sites.

Although the statute requires the EPA to evaluate the effect of the undertaking on the historical site, the language of the statute does not indicate what, if any, further action an agency should take. For example, the statute is silent on the proper disposition of a disagreement between the Advisory Council and the agency over the potential adverse effect of the "undertaking." Nor does section 106 specify what the Advisory Council's opportunity to comment on the project entails. The Advisory Council's regulations and the legislative history, however, demonstrate that the total response required of the agency is quite limited.

■ The Advisory Council has filled the interstices of the statute by defining how federal agencies may discharge their section 106 obligation. See 36 C.F.R. Part 800.1 *et seq.; National Center for Preservation Law v. Landrieu,* 496 F.Supp. 716, 742 (D.S.C.1980) (Advisory Council has discretion to promulgate regulations defining section 106 obligations), *aff'd per curiam,* 635 F.2d 324 (4th Cir.1980). Thus, a procedural regulatory scheme guides agencies contemplating a project, or, in the language of the statute, an "undertaking."[9] The final outcome of that process, however, demonstrates the limited obligation of the agency. Significantly, the regulations

---

**8.** Nor do we believe that this dispute implicates the prosecutorial discretion of the EPA. As we explain below, the EPA is not obliged to enter into an Memorandum of Agreement. Once it has done so, however, it has voluntarily assumed an obligation that is enforceable for as long as it is involved in the project. *See* 36 C.F.R. § 800.6(c) (stating that an agency *"shall carry out the undertaking in accordance with the terms of the agreement"* and that failure to do so reinstitutes the agency's section 106 obligation) (emphasis added).

**9.** An undertaking is a new or continuing project, activity, or program "under the direct or indirect jurisdiction of a Federal agency or licensed or assisted by a Federal agency" which can change the character or use of a historic property. 36 C.F.R. § 800.2(*o*). The regulations require the agency to assess the negative effects of the project on the historic properties. 36 C.F.R. § 800.5.

If the participants agree on how to mitigate any adverse effects, they may enter into a Memorandum of Agreement which will govern the construction of the "undertaking." 36 C.F.R. § 800.5(e)(4). The agency is then obliged to "carry out the undertaking in accordance with the terms of the agreement." 36 C.F.R. § 800.-6(c)(1).

state that if the parties are unable to agree to an accommodation of interest, they may end the section 106 consultation process. 36 C.F.R. § 800.5(e)(6).

Our review of the legislative history of section 106 substantiates our view that Congress did not intend this provision to impose general obligations on federal agencies to affirmatively protect preservation interests. The Advisory Council has only the authority for "reviewing plans for Federal undertakings and the undertakings of others involving Federal assistance or requiring a Federal license which affect sites, structures, and the like listed in the national register...." H.R.Rep. No. 1916, 89th Cong., 2d Sess., 1966 U.S.C.C.A.N. 3307, 3308. Section 106's purposes are limited to ensuring that "the Federal agencies will not work at cross purposes with the goals of historic preservation" and to providing "a meaningful review of Federal or federally assisted projects which affect historic properties identified on the national register." S.Rep. No. 1363, 89th Cong., 2d Sess. 8 (1966).

These limited purposes are supported by the remarks of legislators considering section 106 which emphasize that the purpose of the provision is to promote a cooperative exchange of information. The Advisory Council will advise and report on measures which coordinate the efforts of government agencies and private parties in federal undertakings. 112 Cong.Rec. 25942 (1966) (statement of Rep. Saylor). Furthermore, the committee intended "to provide an opportunity for the Government to coordinate activities affecting historic preservation." This was made necessary because "[g]overnment departments ... need to know what other departments are do-

ing...." *Id.* (statement of Rep. Widnall). "[N]o Federal agency may make money available under ... programs ... which will affect a historically significant structure until account has been taken of these effects and until opportunity has been given the Advisory Council on Historic Preservation ... to comment on the plan." *Id.* at 25940 (statement of Rep. O'Brien).

There is thus no suggestion in either the statute or the legislative history that section 106 was intended to impose upon federal agencies anything more than a duty to keep the Advisory Council informed of the effect of federal undertakings and to allow it to make suggestions to mitigate adverse impacts on the historic sites under its protection. Rather than requiring agencies to independently protect historic preservation interests, it encourages them to do so by facilitating dialogue and consultation. We agree with the Court of Appeals for the District of Columbia that the provisions of NHPA "are aimed solely at discouraging federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control." *Lee v. Thornburgh*, 877 F.2d 1053, 1056 (D.C.Cir. 1989).

Here, the EPA, Virginia's Preservation Officer, and the Advisory Council engaged in the consultation required by the statute and, pursuant to the regulations, entered into the Memorandum of Agreement. The specific section of the agreement at issue requires the EPA, under certain circumstances, to take steps that reopen the section 106 process.[10]

The Citizens' Association concedes that, absent the agreement, the EPA would have

---

**10.** The Memorandum of Agreement states:

The Environmental Protection Agency will insure that the grantee, the Loudoun County Sanitation Authority, will submit any revisions to the final plans for the sewer system project to the Virginia State Historic Preservation Officer for review and approval. If the Virginia State Historic Preservation Officer finds that the final plans significantly deviate from the plans originally approved by his office so as to be detrimental or to cause an adverse effect to the setting and integrity of the Waterford Historic District, he will so

notify the Advisory Council on Historic Preservation and the Environmental Protection Agency, and the Section 106 consultation, pursuant to the National Historic Preservation Act of 1966, will be reopened to attempt to mitigate the adverse effect. The grantee will provide adequate plans and accompanying information to the Virginia State Historic Preservation Officer to facilitate his review. These plans and accompanying information will contain details of proposed actions, if any, affecting the trees, walls, and sidewalks within the Waterford Historic District.

no duty to reinstitute the section 106 procedures. It strenuously urges, however, that the agreement remained in effect—even after the completion of the original project, and that the EPA is therefore required to comply with its terms. According to the Citizens' Association, the developer's application to add new lines to the sewer system is subject to that agreement and therefore the section 106 consultation must be reopened. We have no doubt that the EPA was bound by the Memorandum of Agreement for the period of the undertaking. *See National Center for Preservation Law v. Landrieu*, 496 F.Supp. 716 (D.S.C.), *aff'd per curiam*, 635 F.2d 324 (4th Cir. 1980). In our view, however, the EPA's obligations under it were extinguished by the completion of the sewer system.

■ In effect, the Citizens' Association asks us to rule that the obligation assumed in the agreement itself somehow satisfies the section 106 threshold requirement that an "undertaking" exists. We decline to do so. In our view, federal licensing or funding is required for there to be a statutory undertaking. The EPA's obligation under the Memorandum of Agreement is simply not sufficient.

The Citizens' Association argues that an undertaking exists in this case because the EPA has a continuing opportunity—stemming from the agreement—to exercise authority. *See McMillan Park Comm. v. Nat'l Capital Planning Comm'n*, 759 F.Supp. 908, 915 (D.D.C.1991) (undertaking exists where federal agency had veto power amounting to a licensure); *WATCH v. Harris*, 603 F.2d 310, 319 (2d Cir.) (undertaking exists where federal agency continuously approved funds) *cert. denied*, 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979); *Morris County Trust for Historic Preservation v. Pierce*, 714 F.2d 271, 275 (3rd Cir.1983) (undertaking exists where federal agency had ongoing involvement with project). Our reading of these cases, however, leads us to conclude that they do not go as far as the Citizens' Association argues, largely because they consider compliance with section 106 rather than with a Memorandum of Agreement, and also because they involve continuous, ongoing federal projects.

We agree with the EPA that the obligation it assumed by executing the Memorandum of Agreement lasted only through the life of the original project. The language of section 106, the case law interpreting that language, and its legislative history indicate that the obligations of federal agencies under section 106 relate only to an ongoing "undertaking." Although section 106 authorizes an agreement and although a resultant agreement is binding on the parties to it during the "undertaking," the agreement does not, in turn, perpetuate responsibility extending beyond the term of the undertaking—here the construction of the original sewer project. The judgment of the district court is, therefore, affirmed.

AFFIRMED.